IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SABRINA LEVERETT,** | : | **No. 3:22cv917** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **IRIDIUM INDUSTRIES, INC., d/b/a Artube,** | : | |
| **Defendant** | : | |

# MEMORANDUM

On June 8, 2022, Plaintiff Sabrina Leverett brought this suit against her former employer, Iridium Industries, Inc., alleging violations of various federal and Pennsylvania state employment and discrimination laws. (Doc. 1). Before the court is Iridium's motion for summary judgment on all counts. (Doc. 52).

**Background**[1]

In approximately 2001 or 2002, Plaintiff Sabrina Leverett attended Gibbs College and graduated with an associate's degree in business administration and accounting. (Doc. 52-1 ¶ 1). In 2020, while employed with Iridium, Leverett received her bachelor's degree in business management, which is the highest level of education she has attained, from the University of Phoenix. Id. ¶ 2.

---

[1] Unless otherwise indicated, the court cites to the uncontroverted facts from the parties' statement and counterstatement of facts. (Docs. 52-1, 58, 60-1). Most quotation marks are omitted when quoting from these statements.

Since graduating with her bachelor's degree, Leverett has not had any further courses or schooling, and she does not have any certificates. Id. ¶ 3.

Before approximately 2005, Leverett worked various jobs at McDonald's, a supermarket, and Old Navy. Id. ¶ 7. Leverett worked at Sills, Cummis & Gross, a law firm, from 2005 or 2006 until approximately 2009, assisting real estate attorneys prepare exhibits and paperwork and making copies of documents. Id. ¶ 5. Leverett did not work from around 2009 until March 2013. Id. ¶ 6. Leverett was a Human Resources/Operations Manager at Summit Security Services from March 2013 to 2018, which was her only experience with human resources prior to joining Iridium. Id. ¶ 4. After her employment with Summit Security Services ended, Leverett began looking for employment and applied for a Human Resources Manager job at Iridium, which she found on Indeed. Id. ¶ 8.

Iridium manufactures plastic tubes. Id. ¶ 9. Iridium's President and CEO Khosrow Jacques ("Jack") Sassouni and former Vice President of Sales and Marketing Shahram ("Sam") Ohebsion, who are Iranian, interviewed Leverett in-person at Iridium's facility for the Human Resources Manager position, and Sassouni contacted her the next day, on or around November 1, 2019, to hire her. Id. ¶¶ 10–11. Sassouni made the decision to hire Leverett. Id. ¶ 12. During her employment with Iridium, Leverett reported to Sassouni. Id. ¶ 27.

When Leverett began working at Iridium, she worked Iridium's standard hours of 8:00 A.M. until 5:00 P.M., but later began arriving to work at 8:30 A.M., and during her pregnancy, she began arriving to work around 9:00 A.M. Id. ¶ 28. As Human Resources Manager, Leverett's responsibilities included, but were not limited to, handling recruitment, open enrollment, employee relations, uniforms, and payroll for hourly and salary employees. Id. ¶ 29. Leverett handled all employee complaints. Id. ¶ 30. Leverett handled payroll for hourly employees on a weekly basis and for salary employees bi-weekly. Id. ¶ 31. Leverett was expected to verify overtime with supervisors, fix employees' hours in Iridium's payroll system if their punches were not read, and process the bi-weekly payroll. Id. ¶ 32.

When Leverett was hired, she was living in and commuting from Elizabeth, New Jersey to Iridium's facility in East Stroudsburg, Pennsylvania. Id. ¶ 13. Sassouni asked Leverett to move from New Jersey to Pennsylvania so that she could periodically come to work during the overnight third shift. Id. ¶ 14. Leverett did so without difficulty in December 2019. Id. ¶ 15. Iridium agreed to pay for Leverett's move and initially provided her a loan to do so. Id. ¶ 16. Leverett received a December 11, 2019, check from Iridium, and she was to pay it back in three installments. Id. ¶ 17.

When Leverett was hired, Iridium also interviewed Noelle LaRosa, a white woman, for the Human Resources Manager position. Id. ¶¶ 17–18. LaRosa did not have any human resources experience, but her resume mentioned "quality control," so Sassouni hired LaRosa for a Quality Control Manager position. Id. ¶ 18. LaRosa started working at Iridium with a salary of $75,000 and did not perform human resources duties. Id. ¶ 19. Iridium agreed to pay LaRosa's salary because she came in with some kind of requirement or request, and Iridium has a set budget for each position. Id. ¶ 20. LaRosa's replacement, a white male, started off at $55,000. Id. ¶ 22.

When Leverett was interviewed, she requested to be paid $75,000 per year, which was refused by Sassouni. (Doc. 58 ¶ 104). When Leverett discovered LaRosa's salary, she informed Sassouni that she was upset. (Doc. 52-1 ¶ 21). After Leverett mentioned LaRosa's pay to Sassouni and also mentioned how Leverett's pay had not increased after her probation period, Sassouni forgave the loan he made to Leverett for moving. Id. ¶ 17.

Upon her hire at Iridium, Leverett's annual salary was between $50,000 and $55,000, with the promise of an increase to $60,000 after a probationary period. Id. ¶ 25. After four months of employment, Leverett received a raise to $60,000. Id. ¶ 26.

On her first day at Iridium, during a meeting with Ohebsion, he asked, "why do you people wear that," and when Leverett sought clarification, he responded that he was referring to black women. Id. ¶ 54. Leverett believes Ohebsion assumed she was wearing a wig. Id. On the next day that Sassouni came into the office, Leverett reported Ohebsion's comment, and Sassouni talked to Ohebsion. Id. ¶ 55. Leverett does not know if Sassouni reprimanded Ohebsion. Id. Leverett also alleges that during her first week of employment, Ohebsion stated that he wished he had black people's skin because it does not wrinkle and commented that the black men that the police either beat up or kill are thugs. Id. ¶ 56. Leverett also alleges that Ohebsion frequently touched her shoulder. Id. Leverett testified that she complained to Sassouni about Ohebsion's comments regarding black people's skin and thugs, but she does not know whether Sassouni said anything to Ohebsion about them. Id. ¶ 57. Sassouni testified that he never heard anything about this. (Doc. 58-2 at 104–107). Leverett did not complain to Sassouni regarding Ohebsion's touching of her shoulder because she did not think it was anything "sexual-related." (Doc. 52-1 ¶ 58).

Ohebsion used to call Leverett "Savvy," "Baby," or "Love," or tell her that he loved her, and she told him that he cannot use "words of endearment" and that it was not professional. Id. ¶ 52. According to Leverett, she and Ohebsion did not have any bad relationship and they got along. Id. ¶ 53.

Six months into Leverett's employment, employees told Leverett that former Machine Operator Richard ("Rick") Marcotte called Leverett the "B-word" frequently and the "N-word" twice. Id. ¶ 59. Leverett told Sassouni about it, but she does not know whether he spoke with Marcotte or Marcotte's supervisor about it. Id. Sassouni testified that he did not recall Leverett raising this concern. (Doc. 58 ¶ 107; Doc. 60-1 ¶ 107).

From December 2019 through early 2020, Leverett went into work on the third shift approximately twice a month to check on employees, answer employees' questions, see if anyone needed uniforms, and conduct open enrollment for third-shift employees. (Doc. 52-1 ¶ 23). At some point, Sassouni wanted Leverett on the third shift more often because Plant Manager Wayne Migliaccio complained that no one came in on the third shift. Id. ¶ 24.

Initially, Leverett spent time predominantly in her office at Iridium's facility. Id. ¶ 33. Three months after starting her employment, Sassouni told her that he was tired of hearing Migliaccio complain that Leverett needed to be on the plant floor more often. Id. ¶ 34. Leverett then began going out on the floor. Id. On one occasion, an employee came to see Leverett, but her door was closed, and Migliaccio complained. Id. ¶ 36. Sassouni told Leverett that she needed to leave her door open. Id.

According to Leverett, Migliaccio's multiple complaints of employees coming to see her but her door being closed were made up because he did not like her. Id. ¶ 37; see Doc. 53 at 50–51. And it is Leverett's opinion that Migliaccio demonstrated his dislike for her by complaining to Sassouni that she did not visit the plant floor enough, or about when her door was closed and when she was late to work, or that she needed to enforce proper employee clock-in and clock-out times. (Doc. 52-1 ¶ 38; Doc. 53 at 49–55; Doc. 58 ¶¶ 37–38). Leverett also thought that Migliaccio did not like her because he told other employees, who then told Leverett, that he thought he and Leverett would work together, but that did not happen, and, according to Leverett, when Migliaccio did not like someone, it was his normal practice to watch them on a camera and report everything to Sassouni, which he had done to other employees. (Doc. 52-1 ¶ 39).

On November 3, 2021, First-Shift Supervisor Janneth Carchi emailed Migliaccio, complaining that from the beginning, Leverett made Carchi feel that she had to pick a side between Migliaccio and Leverett, and that working like that for years was very uncomfortable, and that when packers/mechanics came to Carchi about something wrong with their overtime, Carchi had to intervene because the packers/mechanics did not want to [apparently go to Leverett with the problem]. Id. ¶ 43. In an exit interview statement, former Third-Shift

Supervisor Shantae, who left Iridium in the fall of 2021, complained that the HR and Plant Manager could not agree on things and of weekly issues with payroll, and also that Iridium had changed drastically within the last two years. Id. ¶ 44.

On one occasion, Iridium's former maintenance supervisor, Bob Sisco, told Leverett that his head maintenance employee, Wilmer Freire, should get an increase, and Leverett enacted the increase. Id. ¶ 40. On September 2, 2020, Sassouni emailed Leverett about her increasing Freire's salary without consulting anybody and getting permission, informing her that it was the last time she was allowed to modify any employee's salary without consulting with Sassouni or Ohebsion. Id. ¶ 41. In approximately 2020, Leverett paid eight employees for the Labor Day holiday for which they should not have been paid. Id. ¶ 42.

Leverett alleges that, when she told Sassouni around March 2021, three months into her pregnancy, that she was pregnant, he asked her why she would go and do that, and when she began crying, he said "well, what do you want me to say? Congratulations." Id. ¶ 46. According to Leverett, Sassouni made a comment similar to that he would not have hired Leverett if he had known she was going to get pregnant. Id. ¶ 47. Leverett thought Sassouni was upset that he would not have human resources coverage because he stormed off, and "kind of" avoided Leverett for the rest of the day. Id. ¶ 48.

According to Leverett, Ohebsion told Leverett that Sassouni informed him that she was pregnant and asked her why she would go and do that and mentioned that she was not married. Id. ¶ 49. Prior to and during her pregnancy, Ohebsion commented on her weight and what she ate, told her that she needed to eat salad and healthy, and that he was trying to help her not become diabetic like he was. Id. ¶ 50. Leverett alleges that Ohebsion made comments to her that he knew "all the pregnancy stuff," that she was going to get a urinary tract infection, and, while passing each other in a hallway, he commented that he was not moving over. Id. ¶ 51.

Near the beginning of Leverett's pregnancy, in the spring of 2021, she underwent gallbladder surgery to remove stones and was out of work for approximately three days, during which she used paid time off. Id. ¶ 61. While she was having issues with her gallbladder, Leverett was in communication with Sassouni, who asked her how everything was going and to keep him posted, which she did each day. Id. ¶ 62. At the time, Leverett felt that Sassouni was rushing her to come back, as he was asking her via text message when she was coming back to work. Id. ¶ 63. As of April 2021, Leverett was aware of her right to take leave under the FMLA, understood how the FMLA works, and understood that she was generally entitled to FMLA leave for medical issues, such as her gallbladder surgery. Id. ¶ 64.

Leverett's pregnancy was considered high-risk because of her age, and because she had placenta previa, which could cause bleeding during her pregnancy. Id. ¶ 65. During her pregnancy, around approximately twenty-eight weeks, Leverett had a bleed, was in the hospital for approximately three days, and was accordingly out of work. Id. ¶ 66. Due to placenta previa, Leverett had to take caution, including maintaining light duty work and not being on her feet. Id. ¶ 67. Leverett explained to Sassouni that she could no longer walk the plant floor because of her placenta previa. Id. ¶ 71. Leverett received a note from her doctor allowing her to be on light duty and stating that she should be able to go home and put her feet up. Id. ¶ 68. After being discharged from the hospital, she provided this note to Sassouni, explaining that she would need to periodically go home and put her feet up during the workday. Id. Leverett was allowed to go home and put her feet up but felt like she was not able to do it as much as she wanted to because Sassouni complained about her missing work. Id. ¶ 69. Leverett explained to Sassouni that she had the doctor's note, and he asked her to let him know when she needed to go home. Id. ¶ 70. Migliaccio watched the cameras and told Sassouni when Leverett left, but Migliaccio did not know that Sassouni had approved her ability to go home. Id.

On June 24, 2021, Leverett emailed Sassouni and Ohebsion, informing them of, among other things, her upcoming doctor's appointments and the

increasing frequency of appointments as she got closer to delivery. Id. ¶ 72. Ohebsion informed Leverett to put a note on her office door to reference when she was going to be out of the office. Id. ¶ 74. Leverett sent an email because when she verbally informed them of her appointments, Sassouni forgot one. Id. ¶ 73.

In or around September 2021, Leverett contracted COVID-19, subsequently worked remotely beginning on or around September 7, 2021, until her cesarean delivery on September 22nd, and was paid one day late during this period, after she informed Iridium that she had not been paid. Id. ¶ 75. When Leverett had COVID-19, Sassouni commented on one occasion for her to file unemployment. Id. ¶ 76. In 2021, Leverett applied for short-term disability based upon her pregnancy. Id. ¶ 77.

Iridium threw a baby shower for Leverett, for which Ohebsion paid. Id. ¶ 78. On September 22, 2021, Leverett delivered via a cesarean-section and was discharged approximately three days later. Id. ¶ 79. While Leverett was in the hospital, Sassouni contacted her to ask how everything went and how many people needed to be hired. Id. ¶ 80. Leverett also answered some questions with a temporary employee who Leverett hired. Id. Before Leverett was discharged from the hospital, she told Sassouni that she wanted to take at least a week and a half off work while her newborn was in the NICU. Id. ¶ 81. After

Leverett's delivery, she had numerous conversations with Sassouni that she was entitled to the FMLA. Id. ¶ 82. Leverett understood that if she took FMLA leave, it would be unpaid. Id. ¶ 83. However, she did not want to take unpaid leave because she needed the money. Id.

On September 27, 2021, Leverett began working from home. Id. ¶ 84. The next day, she emailed Sassouni to inform him of the hours she would be available to work. Id. ¶ 85. In that email, she wrote that per doctor's orders, she would be working from home for six to twelve weeks, giving an expected date of return to the office of November 29, 2021. Id. ¶ 86. She also informed Sassouni that she could give him "3 hours per day, while the baby is napping, of work-related activity[,]" which was not for medical reasons but accommodated care of her newborn. Id. ¶ 87. She wrote, "I appreciate your willingness to work with me during this time. . . . I am appreciative of the opportunity to continue my duties under this limited temporary schedule." Id. ¶ 88.

After sending the email, Leverett continued to work for the next several weeks. Id. ¶ 89. During that time, Sassouni, and Ohebsion on one occasion, called Leverett during the day regarding work-related issues. Id. ¶ 90. Sassouni asked her when she was going to be back in the office and remarked that he needed someone on the floor and that human resources needed to be there. Id. ¶ 91. Leverett believes Sassouni nagged her about when she was returning

because Migliaccio was nagging Sassouni. Id. Leverett testified that Sassouni repeatedly made remarks she perceived as threats that she would not come back to her position, such as "I don't know what I'm going to do. I may have to look for someone else." (Doc. 58 ¶ 102; Doc. 58-1 at 135–36; Doc. 60-1 ¶ 102).

Leverett occasionally went into the office for approximately ten to fifteen minutes to pick up paperwork, packages, and drug tests for the people Leverett hired at that time, and, on one occasion, for approximately thirty minutes to get her laptop fixed. Id. ¶ 92. Leverett lived two minutes from Iridium's facility. Id. ¶ 93.

On October 21, 2021, Leverett emailed Sassouni that "[d]ue to the ongoing hostile work environment that [she's] complained about to [Sassouni] on many occasions, and the fact that this hostile work environment has only continued and worsened after [her] complaints of unlawful harassment and discrimination, [her] working conditions have become intolerable as any reasonable person in [her] position would agree" and referencing her alleged "constructive discharge." Id. ¶ 94 (citations omitted). Leverett decided to resign because of a build-up of things—the way she was treated during her pregnancy, her having to move to Pennsylvania, and Sassouni not paying her. Id. ¶ 95.

The court will consider these facts as they relate to the operative amended complaint in this matter, (Doc. 8), which alleges 29 claims against Iridium under

the Family and Medical Leave Act ("FMLA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Equal Pay Act ("EPA"), the Americans with Disabilities Act ("ADA"), the Pennsylvania Human Relations Act ("PHRA"), and the Pennsylvania Wage Payment and Collection Law ("WPCL"). Id. at 1–2.

**Jurisdiction**

By seeking relief under various federal statutes, Leverett invokes this court's federal question jurisdiction. 28 U.S.C. § 1331. The court exercises supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

**Standard of Review**

A movant is entitled to summary judgment "when there is no genuine issue of material fact in the case and the moving party is entitled to judgment as a matter of law." Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010) (citation omitted); see also FED. R. CIV. P. 56(a). "A fact is material if its resolution 'might affect the outcome of the suit under the governing law,' . . . [a]nd a dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Mall Chevrolet, Inc. v. Gen. Motors LLC, 99 F.4th 622, 631 (3d Cir. 2024) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

At this stage, the judge's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. All "facts in dispute," Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 187 (3d Cir. 2015), and all "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (cleaned up). "[W]hen there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting version of the parties." Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters & Joiners, 676 F.2d 81, 84 (3d Cir. 1982). Furthermore, "a court's role remains circumscribed in that it is appropriate for a court to resolve factual disputes and to make credibility determinations." Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) (citation omitted). "[W]here the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Id. (citations omitted).

A motion for summary judgment may also be granted where a moving party demonstrates that the nonmoving party "has not made 'a showing sufficient to establish the existence of an element essential to that party's case . . . on which that party will bear the burden of proof at trial.'" Mall Chevrolet, Inc., 99 F.4th at 630 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (emphasis

removed)). After a moving party carries their burden to show the absence of a genuine, material factual dispute, Rule 56 flips the burden onto "the nonmovant to 'go beyond the pleadings and by [her] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'" Daubert v. NRA Grp. LLC, 861 F.3d 382, 391 (3d Cir. 2017) (quoting Celotex Corp., 477 U.S. at 324 (emphasis removed) (alteration in original)). The non-moving party must "do more than 'simply show that there is some metaphysical doubt as to the material facts.'" Id. (quoting Matsushita, 475 U.S. at 586).

In employment discrimination cases, where intent and credibility are crucial issues, the summary judgment standard is applied with added rigor. Qin v. Vertex, Inc., 100 F.4th 458, 469 (3d Cir. 2024) (citation omitted); see also Marzano v. Comput. Sci. Corp., 91 F.3d 497, 509–10 (3d Cir. 1996) ("Employment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this is clearly a factual question, summary judgment is in fact rarely appropriate in this type of case.") (citation modified). Additionally, "there is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion" because "[d]iscriminatory conduct is often subtle and difficult to prove." Weldon v. Kraft,

Inc., 896 F.2d 793, 800 (3d Cir. 1990) (citation modified); see also Paladino v. Newsome, 885 F.3d 203, 209 (3d Cir. 2018) (explaining that witness testimony based on personal knowledge and directed at a material issue is sufficient to defeat summary judgment, even where it is self-serving).

**Analysis**

As a preliminary matter, the court observes that Leverett filed an incomplete brief in opposition that makes no argument and cites to no facts in the record. (See generally Doc. 59). Defendant notes in its reply brief that it "contacted counsel for Leverett on June 13, 2025 to alert her to the version of the brief that she filed." (Doc. 60 at 2 n.3). While Leverett's counsel stated an intention to request leave to amend the brief, id., no such motion has been filed almost a year and a half later. The court considers the brief in opposition the operative brief.

It is the nonmoving party's duty in defending a motion for summary judgment to "rebut the motion with facts in the record." Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). And where "the non-moving party has the burden of proof at trial, that party must set forth facts 'sufficient to establish the existence of an element essential to that party's case." Id. (quoting Celotex Corp., 477 U.S. at 322)). Leverett does none of that here. And so, the court considers defendant's motion unopposed and waived. Still, before granting

summary judgment, the court must consider the undisputed facts, supra, and Iridium's argument, and only grant summary judgment if Iridium "is entitled to it" based upon that consideration. FED. R. CIV. P. 56(e)(3); Anchorage Assocs. v. V.I. Bd. of Tax Rev., 922 F.2d 168, 174–75 (3d Cir. 1990).

## I. FMLA Violation – Interference

Leverett does not oppose the motion for summary judgment with respect to Count I, (Doc. 59 at 8), and that count will be dismissed with prejudice.

## II. FMLA Violation – Retaliation

Iridium argues Count II – FMLA Violation – Retaliation should be dismissed because Leverett cannot establish that she suffered an adverse employment decision. (Doc. 56 at 12–14).

An FMLA retaliation claim requires Leverett to establish that she was protected by the FMLA, requested or took FMLA leave, and that she suffered an adverse employment action causally related to her requesting or taking FMLA leave. Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508–09 (3d. Cir. 2009). An adverse employment action is one which "could have dissuaded a reasonable worker from requesting . . . FMLA leave." Steidle v. U.S. Liab. Ins. Co., 179 F.4th 193, 206 (2026). It exists where the action causes "significant," rather than "trivial" harm. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006). It must be "serious and tangible enough to alter an employee's compensation,

terms, conditions, or privileges of employment." Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir 2004) (quoting Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001)).

Iridium zeroes in on allegations made in the complaint that Sassouni commented that Leverett's "productivity was going downhill" after her gallbladder surgery, and that "Sassouni telephoned Leverett after she gave birth to ask if she was coming back to work the following Monday." (Doc. 56 at 13 (citations omitted)). Iridium argues that neither is an adverse employment decision. Id. The court agrees. The FMLA does not "immunize [Leverett] from . . . petty slights or minor annoyances that often take place at work and that all employees experience." BNSF, 548 U.S. at 68. No reasonable juror would consider such acts "serious and tangible." Storey, 390 F.3d at 764. Leverett also testified that Sassouni made remarks such as "I don't know what I'm going to do. I may have to look for someone else" when Leverett took FMLA leave after the birth of her child. (Doc. 58 ¶ 102; Doc. 58-1 at 135–36; Doc. 60-1 ¶ 102). Even accepting that a reasonable juror could perceive such statements as threats, "sporadic threats of termination . . . do not rise to the level of a materially adverse employment action." Clarkson v. SEPTA, 700 F. App'x 111, 115 (3d Cir. 2017). And unlike many of her other counts, Leverett does not allege constructive discharge to be a result of her alleged FMLA retaliation. (Doc. 8 ¶¶ 58–59). The

motion for summary judgment as to Count II will be granted, and the count will be dismissed with prejudice.

## III. Race Discrimination Claims

### A. Race Discrimination Under Title VII and PHRA

Claims under the PHRA "are interpreted coextensively with Title VII claims." Atkinson v. Lafayette Coll., 460 F.3d 447, 454 n.6 (3d Cir. 2006). For Leverett's racial discrimination claim, the court begins by determining whether she established a prima facie case of racial discrimination. Jones v. School Dist., 198 F.3d 403, 410 (3d Cir. 1999). To do so, Leverett must establish that "(1) [she] was a member of a protected class, (2) [she] was qualified for the position, (3) [she] suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination." D'Ambrosio v. Crest Haven Nursing & Rehab. Ctr., 755 F. App'x 147, 151–52 (3d Cir. 2018) (citing Jones, 198 F.3d at 410–11); see also Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).

Leverett alleges the adverse employment action here was her constructive discharge.[2] (Doc. 8 ¶ 61). Constructive discharge exists when "the employer

[2] Although the amended complaint uses the phrase, "Defendants are liable to Plaintiff for race discrimination, *including* constructive discharge," (Doc. 8 ¶ 61 (emphasis added)), the court can discern no other adverse employment action that plaintiff may be referring to. As the amended complaint offers no clues, and as plaintiff did not make any argument in her brief in opposition, the court proceeds on the assumption that constructive discharge is the only adverse employment action Leverett alleges related to her racial discrimination claim.

knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Goss v. Exxon Off. Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984). Some factors the Third Circuit considers relevant are the threat of discharge, the suggestion to resign or retire, a demotion, reduced pay or benefits, involuntary transfer to a less desirable position, altered job responsibilities, or unsatisfactory job evaluations. Colwell v. Rite Aid Corp., 602 F.3d 495, 502–03 (3d Cir. 2010) (citation omitted).

Iridium distills the racially related comments made to Leverett from the statements of facts into four instances: (1) "On Leverett's first day[,] Ohebsion asked: 'Why do you people wear that?,' which Leverett believes referred to black women wearing wigs"; (2) "During Leverett's first week of employment[,] Ohebsion commented that he wished he had black people's skin because it does not wrinkle."; (3) "During Leverett's first week of employment, Ohebsion commented that the black men that the police either beat up or kill[ ] are thugs."; and (4) "Approximately six months into Leverett's employment, unidentified employees told her that former Machine Operator Richard ('Rick') Marcotte called Leverett the 'N-word' twice." (Doc. 56 at 15 (citations omitted) (alteration in original)).

Iridium argues that these isolated instances do not rise to the level of intolerability that can result in constructive discharge. Id. at 20–21. The court

agrees. No reasonable juror would find that those events, occurring one and a half to two years before Leverett left the company, (Doc. 52-1 ¶¶ 10–11, 94), give rise to an inference that the intolerability of racial discrimination forced Leverett into leaving. Leverett did not even consider those events when she left Iridium. Rather, "Leverett decided to resign because of a build-up of things—the way she was treated during her pregnancy, her having to move to Pennsylvania, and Sassouni not paying her." Id. ¶ 95.

Because Leverett did not establish a prima facie case of racial discrimination, the motion for summary judgment will be granted as to Counts III and XVII, and those counts will be dismissed with prejudice.

### B. Racial Harassment (Hostile Work Environment) Under Title VII and PHRA

"Under Title VII, a hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." Starnes v. Butler Cnty. Ct. of Common Pleas, 50th Jud. Dist., 971 F.3d 416, 428 (3d Cir. 2020) (citation modified). Iridium argues that the comments made to Leverett could not be construed as severe or pervasive. (Doc. 56 at 16). Again, the court agrees. "Offhanded comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." Caver v. City of Trenton, 420 F.3d

243, 262 (3d Cir. 2005) (citation modified). Viewing the record in a light most favorable to the plaintiff, the few comments made by Ohebsion related to race were in the earliest period of Leverett's employment, and only one of those comments implicated Leverett because Ohebsion believed she wore a wig. Further, Leverett testified that she got along with Ohebsion and they did not have a bad relationship. (Doc. 52-1 ¶ 53). As for the comments made by Marcotte, they were not made in Leverett's presence. Id. ¶ 59. And they occurred six months into Leverett's employment. Id. No reasonable juror could construe Leverett as facing severe or pervasive racial hostility under these facts. Indeed, she does not even list racial hostility as a consideration of hers when deciding to leave her position. Id. ¶ 95. The motion for summary judgment as to the racial harassment (hostile work environment) claims will be granted and Counts VIII and XXI of the amended complaint will be dismissed with prejudice.

## IV. Failure to Accommodate Pregnancy Under Title VII and PHRA

Iridium argues that Leverett's failure to accommodate pregnancy counts must fail as a matter of law because neither Title VII nor the PHRA require such accommodation. (Doc. 56 at 25). To the extent Iridium is arguing that neither law requires preferential treatment be given to pregnant women, Iridium is correct. Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 285–86 (1987). To the extent Leverett meant to argue that Iridium provided accommodations to

non-pregnant workers that it refused to provide to Leverett, a form of pregnancy discrimination, see Young v. UPS, 575 U.S. 206, 210–11 (2015), the court finds no facts to support such a claim. And because Leverett did not make any argument in opposition to the instant motion, it is impossible to know whether this was her true intention. The motion to grant summary judgment as to Counts VI and XX will be granted, and those counts will be dismissed with prejudice.

## V. Disability Claims Under the ADA and PHRA

"The PHRA is basically the same as the ADA in relevant respects and Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts." Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002) (citation omitted) (alteration in original). Iridium argues that "[a]lthough asserted as separate claims, Leverett's claims of disability discrimination all involve the allegation that Iridium failed to accommodate an alleged disability." (Doc. 56 at 26). But that is incorrect, because discrimination and failure to accommodate are not synonymous, and Leverett also brings a "discrimination based on perception of disability under the ADA" claim, and a similar claim under the PHRA. (Doc. 8 at 20, 27).

### A. "Regarded as" Claims

"Regarded as" claims do not depend on the existence of a disability. To prove that Leverett was *regarded as* disabled, she "must demonstrate either that:

(1) despite having no impairment at all, the employer erroneously believe[d] that the plaintiff has an impairment that substantially limits major life activities; or (2) the plaintiff has a nonlimiting impairment that the employer mistakenly believe[d] limits major life activities." Tice v. Ctr. Area Transp. Auth., 247 F.3d 506, 514 (3d Cir. 2001). Nowhere in its argument does Iridium engage with whether it "regarded" Leverett as disabled. (Doc. 56 at 26–27). Nor does Iridium holistically engage with whether it discriminated against Leverett because of this alleged regard. Id. Rather, it limits its consideration of possible discrimination to denying its failure to accommodate. Id. at 28. But failure to accommodate is only one of many ways an employer may discriminate based on disability. 42 U.S.C. § 12112(a)–(b). And Leverett alleges constructive discharge as a manifestation of Iridium's disability discrimination. (Doc. 8 ¶¶ 83, 107). For these reasons, Iridium's motion for summary judgment as to Leverett's "regarded as" disability claims, Counts XIV and XXVI, will be denied.

### B. Remaining Disability Claims

Leverett's remaining disability-related claims, ADA and PHRA disability discrimination, and ADA and PHRA failure to accommodate, do depend on the existence of a disability. Eshleman v. Patrick Indus., Inc., 961 F.3d 242, 245 (3d Cir. 2020). For the purposes of these claims, a disability is either (1) "a physical or mental impairment that substantially limits one or more major life activities of

[the] individual"; or (2) "a record of such an impairment." 42 U.S.C. § 12102(1)(A)–(B); see also 43 PA. STAT. § 954(p.1)(1)–(2) (similar). "[M]ajor life activities include . . . caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Iridium argues Leverett's alleged disabilities, "her gallstones in April of 2021," and "her cesarean section in September of 2021" could not be reasonably construed as "substantially limit[ing] a major life activity." (Doc. 56 at 27). As to these medical matters, the court agrees. Nothing in the facts avers that Leverett was limited by them, only that Leverett took three days off because of gallbladder surgery and was released from the hospital three days after the delivery of her baby. (Doc. 52-1 ¶¶ 61–64, 79). Although an impairment of short duration may constitute a disability, Morgan v. Allison Crane & Rigging LLC, 114 F.4th 214, 223 (3d Cir. 2024), it remains the plaintiff's burden to "demonstrate that [her impairment] substantially limits major life activities." Id. As to Leverett's gallstone surgery, the facts relate only Leverett's awareness of her entitlement to time off because of the surgery, not any limitation she experienced because of her gallstones. (Doc. 52-1 ¶¶ 61–64). As to the delivery of her baby, Leverett wanted additional time off from work after her delivery "while her newborn was in

the NICU," not because she was somehow impaired by the delivery. Id. ¶ 81. Because Leverett did not establish how these alleged disabilities substantially limited major life activities, her claims dependent on the existence of those disabilities fail as a matter of law.

The undisputed facts also show that Leverett suffered from a pregnancy complication, placenta previa, that prevented her from walking on the plant floor and required her to periodically leave work and put her feet up. (Doc. 52-1 ¶¶ 65–71). Leverett requested accommodations for this impairment. Id. ¶ 68. "An impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 28 C.F.R. § 36.105(d)(1)(v). Standing, walking, and sitting are major life activities. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i). A reasonable juror could conclude that Leverett had a disability during her pregnancy because most people in the general population do not have to periodically leave work to put their feet up or refrain from walking. But the undisputed facts demonstrate that Leverett was granted the accommodations she requested related to this impairment. (Doc. 52-1 ¶ 69). And so, Leverett fails, as a matter of law, to establish that she was discriminated against because of this disability, and, more specifically, that Iridium failed to accommodate her disability.

While Leverett argues that she did not feel she could use her accommodations as much as she wanted to because Sassouni complained about her absence, id., that fact is properly considered under Leverett's retaliation counts. Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 564 (3d Cir. 2002); see 42 U.S.C. § 12203(b). The motion for summary judgment will be granted as to Counts XIII, XV, XXV, and XXVII and those counts will be dismissed with prejudice.

## VI. Retaliation Claims

Leverett brings retaliation and retaliatory harassment claims under Title VII, the ADA, and the PHRA. (Doc. 8 at 16, 19, 22, 26, 28). Iridium correctly observes that all of these claims depend on Leverett having engaged in "protected employment activity." (Doc. 56 at 28 & n.9 (quoting Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007) (citation omitted) and citing EEOC v. Allstate Ins. Co., 778 F.3d 444, 449 (3d Cir. 2015) (citation omitted)). And Iridium argues that nowhere in the facts is it established that Leverett engaged in any protected activity. Id. at 29. The court disagrees.

As to the ADA retaliation claim, requesting accommodation is a protected activity. Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 191 (3d Cir. 2003). And as discussed above, Leverett did so related to her pregnancy complication.

As for Title VII, when an employee opposes activity that she reasonably believes violates Title VII's standard for unlawful discrimination, she has engaged in protected activity. Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (citations omitted). As for sexual discrimination, the facts demonstrate that Leverett opposed Ohebsion's use of "words of endearment" toward her. (Doc. 52-1 ¶ 52). Leverett also told Sassouni about Marcotte's calling her the "b-word" several times outside her presence. Id. ¶ 59. On the facts before the court, these are the only incidents reflecting possible Title VII protected activity. The court holds that a reasonable employee could believe in good faith that being regularly called "Baby" by her supervisor who "loved her," id. ¶ 52, violates Title VII on the basis of sex.

As for racial discrimination, the facts assert that Leverett complained to Sassouni about Ohebsion's comments regarding black people's skin and his reference to "thugs." Id. ¶¶ 56–57. She also complained to Sassouni about Marcotte calling her the "n-word" outside her presence. Id. ¶ 59. A reasonable employee could believe that such incidents were a violation of Title VII. Kengerski v. Harper, 6 F.4th 531, 534 (3d Cir. 2021). And so, the court does not agree with Iridium that, as a matter of law, Leverett has failed to establish Title VII protected activity.

Either way, Iridium argues that Leverett cannot "establish an adverse action after or contemporaneous with alleged purported protected activity." (Doc. 56 at 29). The court must parse out Leverett's retaliation claims in order to consider this argument.

**A. ADA Retaliation**

Under the ADA, a retaliation claim may be brought under 42 U.S.C. § 12203(b), which makes it "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected" by the ADA. Fogleman, 283 F.3d at 564. Leverett believed she could not utilize her accommodations under the ADA as it pertained to her pregnancy complication because her boss complained about her missing work. (Doc. 52-1 ¶ 69). A reasonable juror could find that such complaints amounted to violations of § 12203(b) meant to dissuade Leverett from using her accommodations. The motion for summary judgment as to Count XVI, and Count XXVIII to the extent it is analogous to the ADA claim, will be denied.

**B. Title VII Retaliation**

The Title VII protected activity discussed above was Leverett's complaints related to Ohebsion calling her "words of endearment" and using racial stereotypes, and Marcotte's use of various slurs. To establish a prima facie case of Title VII retaliation, "a plaintiff must tender evidence that: '(1) she engaged in

activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" Moore, 461 F.3d at 340–41 (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)). The court has scoured the facts and the amended complaint, and the only possible adverse employment action the court can construe Leverett alleging based on her protected Title VII conduct is her alleged constructive discharge. (Doc. 8 ¶ 69). Under Title VII, Iridium's "desire to retaliate" against Leverett's protected conduct must have been the but-for cause of her constructive discharge. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 339 (2013). Here, that is not possible, because Leverett left Iridium for a combination of reasons, including her having to move to Pennsylvania. (Doc. 52-1 ¶ 95). And so, her Title VII retaliation claim fails as a matter of law. The motion for summary judgment as to Count VII, and Count XXVIII to the extent it is analogous to the Title VII claim, will be granted, and those claims will be dismissed with prejudice.

### C. Title VII Retaliatory Harassment

For Title VII retaliatory harassment claims, it is harassment itself that creates a hostile work environment. Lynn v. Bank of N.Y. Mellon, 180 F.4th 133, 147 (3d Cir. 2026). For harassment to rise to the level of creating a hostile work environment, it must be "sufficiently severe or pervasive to dissuade an

objectively reasonable employee from engaging in [protective activity]." Prise v. Alderwoods Grp., Inc., 657 F. Supp. 2d 564, 620 (W.D. Pa. 2009) (citation modified).

After Leverett engaged in protected activity, the facts demonstrate that she was, in relation to her pregnancy, asked by two managers why she would go and get pregnant, was reminded she was not married, and was told by a manager that he would not move over in the hallway (in reference to her size). (Doc. 52-1 ¶¶ 46, 48–49, 51). She was asked repeatedly when she would be coming back to work in general, or the office specifically, when she had gall bladder surgery and when she asked for accommodations related to her pregnancy. Id. ¶¶ 63, 69. She was told by her manager that he might have to look for someone else. (Doc. 58 ¶ 102). And when she contracted COVID-19, she was asked when she would come back to work and was told to file for unemployment. (Doc. 52-1 ¶¶ 75–76). The court holds that such acts could be construed as harassment, and the question of whether such acts were sufficiently severe or pervasive to dissuade a reasonable employee from engaging in protective activity is best left to the trier of fact.

While a claim of retaliatory harassment also requires the establishment of causation—a "link between protected activity" and the harassment, Daniels, 776 F.3d at 196, Iridium does not argue that there is no causation between any

ostensible harassment and protected activity, only that neither exists. Because it is not the court's role to make arguments for Iridium that it did not itself make, Clark v. Sweeney, 607 U.S. 7, 9 (2025) (per curiam) (citations omitted), the motion for summary judgment as to Counts XI and XXIV will be denied.

## VII. Equal Pay Act

To establish a prima facie case of an Equal Pay Act violation, Leverett must demonstrate that "employees of the opposite sex were paid differently for performing 'equal work'— work of substantially equal skill, effort and responsibility, under similar working conditions." Stanziale v. Jargowsky, 200 F.3d 101, 107 (3d Cir. 2000) (citation omitted). Iridium argues Leverett's EPA claim should fail because she does not "identify any male who was paid different that she was." (Doc. 56 at 29). Iridium is correct. The motion for summary judgment as to Count XII will be granted, and the claim will be dismissed with prejudice.

## VIII. Wage Payment and Collection Law

Pennsylvania's Wage Payment and Collection Law "provides employees a statutory remedy to recover wages and other benefits that are contractually due to them." Oberneder v. Link Comp. Corp., 696 A.2d 148, 150 (Pa. 1997). Iridium argues that Leverett's claim under this law fails because "she was paid for all time worked during her employment with Iridium." (Doc. 56 at 30). The court

agrees. While Iridium did pay Leverett a day late in one instance, (Doc. 52-1 ¶ 75), such tardiness is insufficient to trigger relief under the WPCL, which provides a thirty-day grace period before liability attaches. 43 PA. STAT. §§ 260.3(a), 260.10. The motion for summary judgment as to Count XXIX will be granted, and the claim will be dismissed with prejudice.

## IX. Sex-Based Claims

Iridium argues that the remaining claims—sex discrimination, sexual harassment, pregnancy discrimination, and pregnancy harassment, all fail because Leverett cannot establish that any discrimination or harassment she experienced was severe or pervasive. (Doc. 56 at 22–25). And for similar reason, Iridium argues Leverett cannot establish constructive discharge. Id. at 25.

Although pregnancy discrimination is a form of sex discrimination, 42 U.S.C. § 2000e(k); Guerra, 479 U.S. at 277; Cerra v. E. Stroudsburg Area Sch. Dist., 299 A.2d 277, 280 (Pa. 1973)., Leverett brings pregnancy discrimination and pregnancy harassment claims separately from other sex-based claims. And so, the court intuits Leverett's "sex discrimination" and "sexual harassment" claims as encompassing acts outside of those related to her pregnancy.

### A. Sex Discrimination

A prima facie case of sex discrimination requires, *inter alia*, a showing that the plaintiff suffered an adverse employment action. In re Tribune Media Co., 902 F.3d 384, 402 (3d Cir. 2018) (citation omitted). The court construes the adverse employment action alleged here to be Leverett's alleged constructive discharge. (See Doc. 8 ¶ 63). Leverett stated that the reasons she left were because of (1) the way she was treated during her pregnancy; (2) having to move from Pennsylvania; and (3) not being paid. (Doc. 52-1 ¶ 95). Because the court will consider the way Leverett was treated during her pregnancy when considering her pregnancy discrimination claim, there is nothing left in her list of reasons to sustain Leverett's separate sex discrimination claim, and the claim must fail as a matter of law. Even if the court were to consider pregnancy under this claim, the claim fails for the reasons stated in Sections IX(B)–(C), infra. The motion for summary judgment as to Count IV will be granted, and the claim will be dismissed with prejudice.

### B. Pregnancy Discrimination and Harassment

For Leverett to establish a prima facie case of pregnancy discrimination, she must establish "(1) she is or was pregnant and that her employer knew she was pregnant; (2) she was qualified for her job; (3) she suffered an adverse employment decision;" and (4) "whether there is some nexus between her

pregnancy and [the adverse employment decision] that would permit a fact-finder to infer unlawful discrimination." Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 366 (3d Cir. 2008). Again here, the court construes the adverse employment decision Leverett alleges as her constructive discharge. And Iridium claims that Leverett cannot establish constructive discharge.

As previously stated, to establish constructive discharge, "conditions of discrimination in employment [must be] so intolerable that a reasonable person subject to them would resign." Goss, 747 F.2d at 888. As it pertains to her pregnancy, the facts establish that when Leverett first told both of her managers about her pregnancy, they asked Leverett why she "would go and [get pregnant]," Ohebsion commented that she was not married, and Sassouni complained that he would not have hired her if he knew she was going to get pregnant because he was upset that he would have human resources coverage. (Doc. 52-1 at ¶¶ 46-51, 69). Aside from that, Ohebsion commented on Leverett's weight and size during her pregnancy, but also expressed his interest in Leverett staying healthy, encouraging her to eat salads, and trying to help her not become diabetic, as he was. (Doc. 52-1 ¶ 50). "According to Leverett, she and Ohebsion 'didn't have any bad relationship' and 'g[o]t along.'" (Doc. 52-1 ¶ 53 (citation omitted) (alteration in original)). And Iridium threw Leverett a baby shower, paid for by Ohebsion. Id. ¶ 78. No reasonable juror would consider the environment

during Leverett's pregnancy "so unpleasant or difficult" that resignation was "the foreseeable result." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992) (citation omitted).

Similarly, for Leverett's hostile work environment claim related to her pregnancy, she must establish harassment that is "sufficiently severe or pervasive to [have] alter[ed] the conditions of [her] employment and create[d] an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). Title VII is not a "general civility code for the American workplace." Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 80 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" discrimination. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Rather, the workplace must be "permeated with 'discriminatory intimidation, ridicule, and insult.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, 477 U.S. at 65). No reasonable juror with knowledge of these facts would consider Leverett's situation permeated with abuse related to her pregnancy. The motion for summary judgment as to Counts V, X, XIX, and XXIII will be granted, and those counts will be dismissed with prejudice.

### C. Sexual Harassment

Leverett also brings a non-pregnancy-related claim under Title VII and the PHRA for sexual harassment (hostile work environment). So, the court considers whether Leverett has established facts unrelated to her pregnancy that would entitle her to relief under the standard set forth above.[3] The facts allege that Ohebsion frequently touched her shoulder, but Leverett did not complain to Sassouni regarding Ohebsion's touching of her shoulder because she did not think it was anything "sexual-related." (Doc. 52-1 ¶ 58). Other than that, Ohebsion used to call Leverett "Savvy," "Baby," or "Love," or tell her that he loved her, and she told him that he cannot use "words of endearment" and that it was not professional. Id. ¶ 52. According to Leverett, she and Ohebsion did not have any bad relationship and they got along. Id. ¶ 53. No reasonable juror would conclude that such facts establish an environment permeated with sexual harassment. The motion for summary judgment as to Counts IX and XXII will be granted, and those claims will be dismissed with prejudice.

## Conclusions

For the reasons set forth above, the motion for summary judgment will be granted for Counts I through X, XII–XIII, XV, XVII–XXIII, XXV, XXVII, and XXIX,

[3] Even if the court were to consider pregnancy under this section, the claim fails for the reasons stated in Section IX(B), supra.

and those claims will be dismissed with prejudice. The motion will be denied as to Counts XI, XIV, XVI, XXIV, and XXVI. The motion for summary judgment as to Count XXVIII will be granted and that claim will be dismissed with prejudice to the extent it is analogous to Leverett's Title VII retaliation claim, and it will be denied to the extent the claim is analogous to Leverett's ADA retaliation claim. An appropriate order follows.

**DATE:** 10/29/26

**JUDGE JULIA K. MUNLEY**
**United States District Court**